**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

MATTHEW CROWLEY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ERIE INDEMNITY COMPANY and ERIE INSURANCE COMPANY,

Defendants.

Case No. _______________

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Matthew Crowley, by and through his undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendants Erie Indemnity Company and Erie Insurance Company (collectively, "Erie Insurance" or "Defendants"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and their own personal knowledge.

## I. NATURE OF THE ACTION

1. Plaintiff brings this action against Erie Insurance for their failure to properly secure and safeguard highly valuable, protected, personally identifiable information ("PII"); and for their failure to comply with industry standards to protect information systems that contain PII.

2. Erie Insurance is a Fortune 500 company with more than 7 million active policies covering vehicle insurance, life insurance, and property insurance, among others.[1]

---

[1] *Q1 2025 Earnings Release*, Erie Insurance (April 25, 2025), https://www.erieinsurance.com/newsroom/press-releases/2025/1q-2025-earnings-release.

3. In order to obtain an insurance policy through Erie Insurance, customers are required to directly or indirectly entrust Erie Insurance with their PII, which Erie Insurance uses in order to perform their regular business practices.

4. Erie Insurance therefore knowingly collects and stores sensitive PII of their customers, and has a resulting duty to secure such information from unauthorized access and exfiltration.

5. Despite their duties to safeguard their customers' PII, on June 7, 2025, Erie Insurance became aware of a cybersecurity incident as an unauthorized third party broke into Erie Insurance's computer servers and caused a network outage. Erie Insurance did not regain control of their computer systems until June 17, 2025 (the "Data Breach" or "Breach").[2]

6. As a direct and proximate result of Erie Insurance's negligent failure to implement and follow basic security procedures, upon information and belief, Plaintiff's and Class Members' PII is now in the hands of cybercriminals.

7. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

8. Plaintiff brings claims for negligence, breach of implied contract, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the

[2] *Statement: Erie Insurance Information Security Incident,* Erie Insurance (last updated June 27, 2025), https://www.erieinsurance.com/newsroom/press-releases/2025/erie-insurance-network-outage.

adoption of reasonably sufficient data security practices to safeguard the PII in Defendants' possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## II. PARTIES

9. Plaintiff Matthew Crowley, at all relevant times, is and was a citizen of the State of Ohio. Plaintiff has both a homeowner and an auto insurance policy with Erie Insurance.

10. Defendant Erie Indemnity Company is a Pennsylvania corporation with its principal place of business located at 100 Erie Insurance Place, Erie, Pennsylvania, 16530.

11. Defendant Erie Insurance Company is a Pennsylvania corporation with its principal place of business located at 100 Erie Insurance Place, Erie, Pennsylvania, 16530.

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

13. This Court has general personal jurisdiction over Defendants because both Defendants are citizens of the Commonwealth of Pennsylvania.

14. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendants reside in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District; and Defendants conduct substantial business within this District.

## IV. FACTUAL BACKGROUND

### A. Erie Insurance's Stores Highly Sensitive Data.

15. Erie Insurance is a Fortune 500 company and the 17th largest property/casualty insurer in the United States. They have more than 7 million policies in force and operate in twelve states and the District of Columbia.[3]

16. As part of their routine business practices, Erie Insurance is entrusted with their customers' PII.

17. When entrusting Erie Insurance with their PII, Plaintiff and Class Members reasonably expect Defendants would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

18. However, despite Defendants' commitment to data security, Erie Insurance failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII by unauthorized bad actors.

### B. The Data Breach.

19. On or about June 7, 2025, Erie Insurance became aware of a potential cybersecurity incident as an unauthorized third party remotely broke into Erie Insurance's computer servers causing a system-wide outage. Erie Insurance was not able to gain control of their computer systems until June 17, 2025.[4]

---

[3] *Q1 2025 Earnings Release*, *supra* n. 1.
[4] *Statement: Erie Insurance Information Security Incident*, *supra* n. 2.

20. The Data Breach affected access to Erie Insurance's customer portal, making it hard to submit claims, and there have reportedly been delays in receiving paperwork from the company.[5]

21. In order to initiate a claim during the Data Breach, policyholders had to either contact their local Erie Insurance agent or First Notice of Loss team by phone.[6]

22. Private assessments of the Data Breach indicate that Erie Insurance failed to implement basic steps to safeguard the PII that they were entrusted.

23. On June 8, 2025, Erie Insurance reported the Data Breach via a press release indicating that it had become aware of unusual activity on its network and issued subsequent updates as its investigation into the Data Breach continued.[7]

24. During Erie Insurance's network outage, Erie Insurance advised its policyholders that "Erie Insurance will not contact customers by phone or email to request payments" and further advised its policyholders to "not click on any links from unknown sources or share your personal information via phone or email."[8]

25. While Erie Insurance has yet to publicly confirm the compromise or exfiltration of policyholder data during the Data Breach, Erie has advised its customers to "follow best practices around personal security" and to "notify their financial institutions of any unusual activity."[9]

[5] Steve Alder, *Erie Insurance Experiencing Business Disruption Due to Cyberattack*, The HIPAA Journal (June 18, 2025), https://www.hipaajournal.com/erie-insurance-cyberattack/.
[6] *Statement: Erie Insurance Information Security Incident*, *supra* n. 2.
[7] *Id*.
[8] *Id.*
[9] *Id.*

26. Upon information and belief, the Data Breach occurred as a direct and proximate result of Erie Insurance's failure to implement and follow basic security procedures in order to protect their customers' PII stored in Defendants' computer network.

**C. Scattered Spider**

27. While Erie has not confirmed the identity of the group that caused the network outage, experienced cybersecurity analysts have inferred that the cyberattack is likely the work of the cybercrime group known as "Scattered Spider," which targets large companies in a single sector at time.

28. "Scattered Spider is a collective of mostly English-speaking hackers, typically teenagers and young adults, who are financially motivated to steal and extort sensitive data from company networks."[10]

29. Scattered Spider typically operates by engaging in social engineering tactics to bypass companies' multi-factor authentication and gain access to companies' computer networks. The group does this by impersonating an employee when contacting an IT help desk or other third-party IT vendor, tricking them into enrolling unauthorized multi-factor authentication devices or resetting user credentials. Once inside a company's computer network, the group will escalate user privileges, disable recovery systems, and exfiltrate sensitive data.

30. Erie Insurance thus far appears to be the first in a series of insurance company cybersecurity attacks conducted by Scattered Spider in June 2025. Philadelphia Insurance

---

[10] Zack Whittaker, *FBI, cybersecurity firms say a prolific hacking crew is now targeting airlines and the transportation sector*, TECH CRUNCH (June 28, 2025) https://techcrunch.com/2025/06/28/fbi-cybersecurity-firms-say-scattered-spider-hackers-now-targeting-airlines-transportation-sector/.

Companies announced a similar network disruption beginning June 9, 2025, just two days after Erie Insurance discovered a disruption to its network.[11]

31. Indeed, following the cluster of attacks, on June 16, 2025, Google Threat Intelligence Group reported that it was aware of "multiple" intrusions in the U.S. insurance industry that bore the hallmarks of Scattered Spider.[12]

32. Insurance Business reports that the breaches are likely related:

> While the companies did not confirm a link, the similarity in timing and scope has prompted cybersecurity analysts to investigate the possibility of coordinated intrusions. Both insurers cited the detection of unauthorized access as the cause for system shutdowns, underscoring growing concerns around sector-wide vulnerabilities. Investigators and industry analysts have pointed to the possibility of involvement by a threat actor known as Scattered Spider, also referred to as UNC3944.[13]

33. Bank Info Security reports on the likelihood that data was stolen:

> The two companies' statements that so far neither Erie Insurance nor the Philadelphia insurance have found evidence of ransomware encryption suggests the attacks instead potentially involved data theft, some experts said. "The possibility of data exfiltration remains a concern, as threat actors can leverage stolen data for various malicious activities," said Petere McMurtrie, a partner in consulting firm West Monroe's insurance practice.[14]

34. In addition to Philadelphia Insurance Companies, Aflac Incorporated ("Aflac") detected a breach on its network by cyber criminals using social engineering tactics on June 12,

---

[11] Kenneth Araullo, *Philadelphia Insurance outage not linked to ransomware, company says*, INSURANCE BUSINESS (June 23, 2025), https://www.insurancebusinessmag.com/us/news/cyber/philadelphia-insurance-outage-not-linked-to-ransomware-company-says-540108.aspx.
[12] https://www.scworld.com/news/scattered-spider-group-attacking-us-insurance-industry-google-says
[13] Araullo, *supra* n. 11.
[14] Marianne Kolbasuk McGee, *Two Insurers Say Ongoing Outages Not Ransomware-Based*, BANK INFO SECURITY (June 19, 2025), https://www.bankinfosecurity.com/two-insurers-say-ongoing-outages-are-caused-by-ransomware-a-28758.

2025. The number of affected individuals is currently unknown, and comprised data includes "claims information, health information, social security numbers, and/or other personal information, related to customers, beneficiaries, employees, agents, and other individuals in [Aflac's] U.S. business."[15]

35. The insurance industry as a target is well-known because "[i]nsurance companies have a rich set of data criminals can use for identity theft, medical identity theft, email addresses, possibly credit card data and other useful information." [16]

36. CNN reports that the Aflac breach is consistent with the attacks on Erie Insurance and Philadelphia Insurance Companies. [17]

37. Scattered Spider is known to pose as tech support in order to infiltrate big corporations and to target "big swaths of American industries at a time."[18]

38. In addition to targeting industry leaders, Scattered Spider is known to exploit the contractors and vendors that provide third-party help desk and customer services support.[19]

39. In 2023, Scattered Spider infiltrated MGM Resorts and Caesars Entertainment, stealing customer data and sowing operational chaos.[20]

---

[15] *Aflac Incorporated Discloses Cybersecurity Incident*, AFLAC (June 20, 2025 08:00 AM) https://www.prnewswire.com/news-releases/aflac-incorporated-discloses-cybersecurity-incident-302487036.html?tc=eml_cleartime.

[16] Marianne Kolbasuk McGee, *Two Insurers Say Ongoing Outages Not Ransomware-Based*, BANK INFO SECURITY (June 19, 2025), https://www.bankinfosecurity.com/two-insurers-say-ongoing-outages-are-caused-by-ransomware-a-28758 (citation omitted).

[17] Sean Lyngaas, *Cybercriminals breach Aflac as part of hacking spree against US Insurance industry*, CNN (June 20, 2025, updated 11:49 AM), https://www.cnn.com/2025/06/20/tech/aflac-cyberattack.

[18] *Id.*

[19] Rachel Dillin, *FBI Issues Warning After Hackers Breach Major U.S. Airlines*, MSN (June 29, 2025), https://www.msn.com/en-us/travel/other/fbi-issues-warning-after-hackers-breach-major-u-s-airlines/ar-AA1HEuMR?ocid=BingNewsSerp.

[20] *Id.*

40. Scattered Spider also targets European countries. Earlier this year in April 2025, Scattered Spider targeted retail giants Marks & Spencer, Co-op, and Harrods.[21]

41. "Insurance companies are attractive targets for Scattered Spider because they handle vast amounts of sensitive customer data, including personal information, financial records, and health data, which can be targeted for data theft and extortion. Insurance companies often have large help desk and outsourced IT functions that are susceptible to social engineering attacks, which align directly with Scattered Spider's competencies and playbooks. The global and complex structure of many of these insurance firms makes comprehensive security and detection of malicious activity significantly difficult as well."[22]

42. Targeting multiple companies in the same industry is one of Scattered Spider's signature moves. As CPO Magazine reports:

> After spending a chunk of the early part of the year attacking the UK retail sector, there were warnings from the cybersecurity world that the Scattered Spider hacking group would be looking overseas and possibly at new industries. That premonition has come to pass as the Google Threat Intelligence Group is now reporting 'multiple intrusions' at US-based insurance firms, which in some cases has caused outages and business disruptions. The pattern tracks known habits of the group, which has previously hyper-focused on certain industries or regions for weeks before abandoning them and moving on to some other concentration.[23]

43. In addition to being foreseeable, the attack on Erie Insurance was also preventable because "[Scattered Spider] has not changed its core tactics much from when it first emerged in

---

[21] Ravie Lakshmanan, *Scattered Spider Behind Cyberattacks and M&S and Co-op, Causing Up to $592M in Damages*, THE HACKER NEWS (June 21, 2025), https://thehackernews.com/2025/06/scattered-spider-behind-cyberattacks-on.html.

[22] Scott Ikeda, *Scattered Spider" Threat Group Has Moved on To Targeting US Insurance Companies*, CPO MAGAZINE (June 23, 2025), https://www.cpomagazine.com/cyber-security/scattered-spider-threat-group-has-moved-on-to-targeting-us-insurance-companies/.

[23] *Id.*

2023. That means that here is already a robust playbook for defending against their approaches."[24]

44. The FBI also suspects Scattered Spider may be behind recent ransomware and data extortion attacks on the airline industry, including WestJet Airlines on June 13, 2025 and Hawaiian Airlines on June 26, 2025.[25]

45. Because Scattered Spider has a history of exfiltration of personal information when it causes an outage, upon information and belief, it has successfully accessed and exfiltrated data, including the PII of Plaintiff, from Defendants.

**D. The Value of Private Information and Effects of Unauthorized Disclosure.**

46. Erie Insurance was well aware that the protected PII which they acquire is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

47. Erie Insurance also knew that a breach of their computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

48. These risks are not theoretical, numerous high-profile breaches have occurred at companies such as Anthem, Excellus, State Farm, Blackbaud, Fortra, Snowflake, Progress Software, Change Healthcare, and Accellion, amongst others, in recent years. These breaches put Defendants on notice that their electronic records would be targeted by cybercriminals.

49. PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes

[24] *Id.*

[25] James Coker, *Scattered Spider Actively Targeting Airlines, FBI Warns*, INFOSECURITY MAGAZINE (June 30, 2025), https://www.infosecurity-magazine.com/news/scattered-spider-targeting/.

including identity theft, and medical and financial fraud.[26] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

50. Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2024, there were 6,670 recorded data breach incidents, exposing over 16.8 billion records. The United States specifically saw a 12% year-over-year increase in data breaches as compared to 2023.[27]

51. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, approximately 2.675 million people reported some form of identity fraud compared to approximately 6.5 million people in 2024.[28]

52. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

---

[26] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited July 2, 2025).

[27] *2025 Global Threat Intelligence Report*, Flashpoint, https://go.flashpoint.io/2025_GTIR (last visited July 2, 2025).

[28] *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited July 2, 2025); https://www.iii.org/graph-archive/96074 (last visited July 2, 2025).

53. The ramifications of Erie Insurance's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

54. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[29]

55. Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

56. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

---

[29] Dr. Erika Harrell, *Victims of Identity Theft*, *2018*, U.S. DEP'T OF JUST., Bureau of Just. Stat., NCJ 256085 (April 2021), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

57. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[30] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[31]

58. A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[32]

59. Due to high-profile data breaches at other companies, Defendants knew or should have known that their customers' information would be targeted by cybercriminals.

60. Defendants also knew or should have known the importance of safeguarding the PII with which they were entrusted and of the foreseeable consequences if their data security systems were breached. Erie Insurance failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of their customers' PII from occurring.

**E. Plaintiff and Class Members Suffered Damages.**

61. The ramifications of Erie Insurance's failure to keep their customers' PII secure are long-lasting and severe. Defendants' conduct, which allowed the Data Breach to occur, caused

[30] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[31] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.
[32] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

62. In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[33] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Defendants', are both time-consuming and of only limited and short-term effectiveness.

63. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove

[33] Government Accountability Off., *Data Breaches* (Mar. 2019), https://www.gao.gov/assets/gao-19-230.pdf.

fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[34]

64. Erie Insurance recognizes the certainly impending and increased risk of identity theft and fraud that Plaintiff and Class Members now face as they have stated that they "encourage customers to follow best practices around personal security and notify their financial institutions of any unusual activity" as well as alerting their customers to the risks of spam calls and emails.[35]

65. Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

66. There may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PIIs stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[36]

67. For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct.

68. The value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it

---

[34] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited July 2, 2025).
[35] *Statement: Erie Insurance Information Security Incident*, *supra* n. 2.
[36] *See* 2007 GAO Report, at 29.

has been compromised, criminals will use them and trade the information on the cyber black market for years thereafter.[37]

69. The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

70. Plaintiff and Class Members are also at a continued risk because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect their customers' PII.

71. As a result of Erie Insurance's failures, Plaintiff and Class Members face an increased risk of potential scams, identity theft and fraud, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

72. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

**F. Plaintiff's Experience.**

73. Plaintiff is a customer of Erie Insurance, possessing both a homeowner and an auto insurance policy. In order to obtain these policies, Plaintiff was required to entrust Erie Insurance with his PII. In collecting and maintaining the PII of Plaintiff, Defendants undertook a duty to act reasonably in their handling of Plaintiff's PII. Erie Insurance, however, did not take reasonable

[37] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

care of Plaintiff's PII, leading to its exposure and compromise as a direct result of Defendants' inadequate data security measures.

74. Upon learning about the Data Breach, on or about June 27, 2025, Plaintiff called Defendants to confirm whether or not his PII was exposed to bad actors. Defendants referred Plaintiff to their website, which contained only vague, periodic updates. Defendants further explained that they were working with law enforcement and experts to determine more information. Despite being asked directly and specifically by Plaintiff to confirm that Plaintiff's PII was safe and had not been exfiltrated, Defendants were not able to do so.

75. Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent scammers accessing his account; (b) mitigation efforts to prevent the misuse of his PII; (c) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (d) loss of privacy.

76. Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiff faces a significant, present, and ongoing risk of scams, identity theft and fraud, and other identity-related fraud now and into the indefinite future.

77. In addition, knowing that hackers gained access to his PII and that this information likely has been and will be used in the future for scams, identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## V. <u>CLASS ACTION ALLEGATIONS</u>

78. Plaintiff, individually and on behalf of all others similarly situated, brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Erie Insurance Data Breach (the "Class").

79. Excluded from the Class are Defendants, their subsidiaries and affiliates, their officers, directors, and members of their officers' and directors' immediate families, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

80. Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

81. **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendants' records, including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class, at minimum, comprises millions of individuals.

82. **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class Members. Such common questions include, but are not limited to:

- Whether and to what extend Defendants had a duty to protect the PII of Plaintiff and Class Members;

- Whether Defendants were negligent in collecting and storing Plaintiff's and Class Members' PII;
- Whether Defendants had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;
- Whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;
- Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;
- Whether Defendants breached their duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;
- Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and
- Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

83. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendants to safeguard their PII. Plaintiff and Class Members entrusted Defendants with their PII, and it was subsequently accessed by an unauthorized third party.

84. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

85. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

86. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendants breached their duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

87. **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendants' books and records.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

88. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 87 as if fully set forth herein.

89. Defendants owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

90. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiff's and Class Members' PII in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; and (d) maintaining data security measures consistent with industry standards.

91. Erie Insurance's duty to use reasonable care arose from several sources, including but not limited to those described below.

92. Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting and storing valuable PII

that is routinely targeted by criminals for unauthorized access, Erie Insurance was obligated to act with reasonable care to protect against these foreseeable threats.

93. Defendants also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiff and Class Members. Erie Insurance's conduct included their failure to adequately restrict access to their computer networks and/or servers that held individuals' PII.

94. Defendants also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach in the financial sector.

95. Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent. Erie Insurance breached these duties by, among other things: (a) mismanaging their system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow their own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

96. But for Erie Insurance's wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their PII would not have been accessed, exfiltrated, and compromised by cybercriminals.

97. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries including:

a. Theft of their PII;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h. Damages to and diminution in value of their PII entrusted to Erie Insurance with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long

as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

98. As a direct and proximate result of Erie Insurance's negligence, including their gross negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

99. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 87 above as if fully set forth herein.

100. As a condition of providing their services, Erie Insurance required Plaintiff and Class Members to directly or indirectly entrust them with their PII.

101. As a result of these transactions, Plaintiff and Class Members entered into implied contracts with Erie Insurance by which Erie Insurance agreed to safeguard and protect such PII and keep such PII secure and confidential from unauthorized access.

102. When entering into these implied contracts, Plaintiff and Class Members reasonably believed and expected that Erie Insurance's data security practices complied with their statutory and common law duties to adequately protect Plaintiff's and Class Members' PII.

103. Indeed, implicit in these exchanges was a promise by Erie Insurance to ensure the PII of Plaintiff and Class Members in their possession would be used to provide the agreed-upon services and that Erie Insurance would take adequate measures to protect Plaintiff's and Class Members' PII.

104. It is clear by these exchanges that the parties intended to enter into implied agreements supported by mutual assent. Plaintiff and Class Members would not have disclosed

their PII to Erie Insurance but for the prospect of Erie Insurance's promise of services. Conversely, Erie Insurance presumably would not have taken Plaintiff's and Class Members' PII if not for the intent to provide Plaintiff and Class Members with their services.

105. Plaintiff and Class Members would not have provided their PII to Erie Insurance had they known that Erie Insurance would not safeguard their PII as promised or provide timely notice of a data breach.

106. Plaintiff and Class Members fully performed their obligations under their implied contracts with Erie Insurance.

107. Erie Insurance breached their implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII.

108. As a direct and proximate result of Erie Insurance's breach of contract, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 97 above.

109. As a direct and proximate result of Erie Insurance's breach of implied contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## UNJUST ENRICHMENT
## (On Behalf of Plaintiff and the Class)

110. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 87 as if fully set forth herein.

111. Plaintiff and Class Members conferred a monetary benefit on Erie Insurance by providing them with their valuable PII.

112. Erie Insurance knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them.

Defendants profited from Plaintiff's and Class Members' PII and use of Plaintiff's and Class Members' PII for business purposes.

113. Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

114. Erie Insurance acquired the PII through inequitable record retention as they failed to disclose the inadequate data security practices previously alleged.

115. If Plaintiff and Class Members had known Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Defendants.

116. Under the circumstances, it would be unjust for Erie Insurance to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

117. Plaintiff and Class Members are without an adequate remedy at law.

118. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 97 above.

119. Plaintiff and Class Members are entitled to restitution and/or damages from Erie Insurance and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, as well as the return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

## FOURTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiff and the Class)

120. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 87 as if fully set forth herein.

121. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

122. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Erie Insurance is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants still possess Plaintiff's and Class Members' PII, and that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

123. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure the PII under the common law; and

b. Defendants continue to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

124. This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect the PII in their possession.

125. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Erie Insurance. The risk of another such breach is real, immediate, and substantial. If another breach at Erie Insurance occurs, Plaintiff and Class Members will not have an adequate remedy at law because

many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

126. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

127. Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

## VIII. JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: July 2, 2025

**LYNCH CARPENTER, LLP**

*/s/ Gary F. Lynch*
Gary F. Lynch (PA 56887)
gary@lcllp.com
Patrick D. Donathen (PA 330416)
patrick@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246

*Attorneys for Plaintiff and the Proposed Class*